**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JULIA M. KLINE o/b/o J.H.-K., a minor,** | ) | |
| | ) | |
| **Plaintiff-Claimant,** | ) | |
| | ) | **No. 11 C 50376** |
| **v.** | ) | |
| | ) | **Iain D. Johnston** |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant-Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Julia Kline, on behalf of her minor son J.H.-K. (hereinafter, "Claimant"), brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying Claimant's application for supplemental security income ("SSI") benefits. This matter is before the Court on cross-motions for summary judgment [Dkt. #14, 19].

Claimant argues that the Commissioner's decision denying his application for SSI should be reversed or remanded for further proceedings because the Administrative Law Judge ("ALJ") provided a deficient functional equivalence determination regarding his ability to attend and complete tasks, and erroneously determined that Claimant's combination of impairments did not meet or medically equal Listing 112.11A. For the reasons set forth more fully below, Claimant's motion for summary judgment [Dkt. #14] is granted in part and the Commissioner's motion for summary judgment [Dkt. #19] is denied. The Commissioner's decision is reversed, and this

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

matter is remanded to the Social Security Administration ("SSA") for further proceedings consistent with this Memorandum Opinion and Order. On the present record, this Court declines to remand with an order to award benefits.

In reviewing denials of Social Security benefits, the Court understands that it cannot reweigh the evidence presented to the SSA or engage in *de novo* review. But the Court also recognizes that it cannot rubber-stamp the Commissioner's decision. Instead, the Court must engage in a critical review of the evidence. In doing so, the Court needs to assure itself that the ALJ's decision possesses a logical bridge to the conclusion. Part of the "logical bridge" analysis requires the ALJ to confront evidence that is contrary to the ALJ's ultimate conclusion and explain why that evidence was insufficient. The ALJ cannot merely turn a blind eye to that evidence, which is what occurred here. *See Ribaudu v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Tyson v. Astrue*, 08-CV-383-BBC, 2009 WL 772880, at \*10 (W.D. Wis. Mar. 20, 2009).

# I. BACKGROUND

## *A. Procedural History*

Claimant filed an application for SSI benefits on July 9, 2008, alleging a disability onset date of July 1, 2008. R. 81. The Commissioner denied the application initially on November 10, 2008, and upon reconsideration on January 2, 2009. R. 81. Claimant filed a timely written request for a hearing on January 14, 2009. R. 81, 113. The ALJ conducted a video hearing on August 19, 2010. R. 81. Claimant and his mother attended the hearing and testified. R. 32. Counsel represented the Claimant at his hearing. R. 32.

On September 20, 2010, the ALJ issued a decision denying the claim for benefits. R. 78-93. Claimant filed a timely request to review the ALJ's decision on September 29, 2010. R. 7. The Appeals Council denied review on October 21, 2011, making the ALJ's decision the final

decision of the Commissioner. R. 1-3.  Claimant subsequently filed this appeal pursuant to 42

U.S.C. § 405(g).  Claimant's objections to the ALJ's decision are limited to 1) her determination

that Claimant does not meet the criteria set forth in Listing 112.11A; and 2) her findings in the

domain of attending and completing tasks.  Accordingly, the Court will focus on the facts in the

record related to those findings.

### B. Hearing Testimony

#### 1.  Julia Kline – Claimant's Mother

Ms. Kline testified that Claimant was six years old at the time of the hearing before the

ALJ on August 19, 2010. R. 4.  She testified that Claimant lives with her, an older sister, and a

younger brother in a house in Rockford, Illinois. R. 35.  Ms. Kline testified that Claimant's father

is incarcerated.  R. 36.

Ms. Kline testified that Claimant was scheduled to begin second grade the week after the

hearing. R. 37.  Claimant was in regular classes and did not have an individual education plan

("IEP"). R. 37.  Claimant passed most of his subjects the year before. R. 38.  Ms. Kline testified

that she attempted to obtain an IEP four times and asked the Board of Education to provide

Claimant help with his behavioral problems, but the Board denied her requests. R. 37, 41.  Ms.

Kline testified that Claimant did not attend counseling or special education classes at school, but

that he sees the school social worker when he has one of his "episodes" or is "throwing a fit". R.

37.  She estimated that Claimant met with the social worker one to two times per month. R. 37.

Ms. Kline testified that during first grade, Claimant had a few incidents of acting out and

hitting his teachers, and was suspended twice. R. 40.  Because of Claimant's behavior, his

doctors adjusted his medication multiple times and his teacher and the principal allowed him to

"set his own agenda" when he began acting out. R. 40.  Ms. Kline also testified that she "bribed"

Claimant to behave by allowing him more time to play video games. R. 40. Despite these accommodations, Ms. Kline testified that the school sent home multiple notes related to his bad behavior, and that he fought with another student but was not suspended. R. 41. She testified that Claimant was unable to pay attention and focus at school. R. 42. Claimant originally rode the bus to school, but was suspended from the bus. R. 62.

Ms. Kline testified that a therapist and psychiatrist treated Claimant at the Janet Wattles Center. R. 41. She testified that despite the doctor's recommendation, Claimant did not participate in organized activities because she did not have transportation and worried that he would act out. R. 43-44. Ms. Kline also testified that Claimant missed therapy sessions because of the lack of transportation. R. 44. Ms. Kline reported that the therapy sessions had not helped Claimant, but that Claimant's focus and attitude had significantly improved with the new medication, Abilify[2]. R. 54.

Ms. Kline told the ALJ that Claimant generally got along with her, but that he occasionally slammed his door, ran from her, hid, and hit his hands and head on the wall. R. 46, 57-58. Ms. Kline testified that Claimant had a serious rage problem, and she believed Claimant showed signs of bipolar disorder, which ran in the family. R. 46, 60. Ms. Kline testified that Claimant usually calmed down on his own after screaming his fits away, but she had to take him to the emergency room once for being out of control. R. 47.

Generally, Claimant got along with his siblings, but he had few friends at school because he was controlling. R. 28. Claimant played video games on a regular basis. R. 49. He focused on his video games for no more than 10 to 15 minutes at a time. R. 49. Claimant played with

---

[2] Abilify is an atypical antipsychotic prescribed for the acute treatment agitation associated with schizophrenia and bipolar I disorder and as an adjunct to antidepressants for the treatment of major depressive disorder. *See* Physician's Desk Reference 2630 (67th ed. 2013).

neighborhood children at a park near his house and attended vacation bible school over the summer, but was removed from a park district day camp for arguing. R. 43-44, 59-60. Ms. Kline testified that Claimant stole video games from his friends' houses and candy from a convenience store. R. 59-60.

Ms. Kline testified that she and Claimant's sister tried reading with Claimant, but he got frustrated and gave up. R. 50. Claimant also failed to bring half of his first grade homework assignments home, and Ms. Kline had to supervise Claimant to make sure he completed his assignments. R. 51. Ms. Kline told the ALJ that Claimant performed chores at home, including cleaning his room and the living room, and that he was good at taking showers and baths. R. 52. However, she reported that he occasionally soiled himself and refused to change his clothes. R. 53.

### 2. Claimant

Claimant testified that he was looking forward to starting second grade. R. 63. He testified that his favorite subject was reading and his favorite book was Mickey Mouse. R. 63-64. He testified that he did not like recess because other children bullied him on the playground. R. 64. Claimant told the ALJ that he could not pay attention sometimes because he was tired. R. 65. He testified that when he got in trouble for not paying attention, he sat in his seat for 10 to 20 minutes but was not taken to the principal's office. R. 65. Claimant testified that he had friends at school. R. 65. He named two of his friends from school, and testified that he played with them on the slides and flew paper airplanes with them. R. 65. Claimant testified that he played hide and seek with two neighborhood friends. R. 66.

Claimant told the ALJ that sometimes he got mad and did not know why. R. 66. He testified that his counselor, Jim Brown, taught him how to deal with his anger. R. 67. He

testified that when he became angry, he would sit down, relax, and apologize for his behavior. R. 67. Claimant denied hitting anything, running away, or slamming doors during his fits of anger. R. 67, 71. Claimant testified that he just pushed the door closed "softly like boom" when he is angry at home. R. 71. Claimant testified that his mother sent him to his room for 10 to 20 minutes when he got in trouble for leaving the yard and getting distracted. R. 72-73. He testified that he took his medication every day, but that his mother forgot to give him his medication the day of the hearing. R. 69.

Claimant testified that his school suspended him twice because of his behavior. R. 68. He testified that during the first incident, he acted out because some of his classmates were not being nice to him. R. 68-69. During the second incident, he hit his teacher because he was tired and cranky. R. 69. Claimant testified that he knew that his behavior was not "the right thing to do". R. 69.

Claimant testified that he helped with chores around the house, including cleaning his bedroom and the bathroom, doing the dishes, and washing the windows. R. 67-68. Claimant testified that he liked riding his bike. R. 73. Claimant testified that he did not act out of control at home. R. 69. Claimant testified that he did his homework every night with his sister, and that he accidently left some of his homework on the bus. R. 70. He testified that he completed extra assignments to make up for the missing homework. R. 71. Claimant told the ALJ that he got along well with his sister and did not fight with her. R. 73-74.

**C. *School Records***

Claimant attended Whitehead Elementary School in Rockford, Illinois. R. 186. Claimant did not receive special education services. The school did not complete an IEP for Claimant.

The record includes one teacher questionnaire completed in 2008 by Claimant's kindergarten teacher, Kim Williams. R. 186-195. The questionnaire contained 10 categories in the domain of acquiring and using information, 13 categories in attending and completing tasks, and 15 categories in interacting and relating with others. The questionnaire asked the teacher to rank Claimant's functioning in each category on a scale of 1 through 5: 1 indicated no problem; 2 indicated a slight problem; 3 indicated an obvious problem; 4 indicated a serious problem; and 5 indicated a very serious problem. R. 133-136.

The questionnaire showed some problems, primarily in the attending and completing tasks domain. In this domain, Ms. Williams indicated that Claimant had obvious problems in 1 category, slight problems in 4 categories, and no problems in 8 categories. In the interacting and relating to others domain, Ms. Williams noted slight problems in playing cooperatively with others, but no problems in the remaining categories of this domain. Ms. Williams marked "no problems" in all of the other domains. Ms. Williams noted that she knew when Claimant did not take his medication because on those occasions, he had more behavioral problems and issues with focusing. R. 186-195.

Claimant's first grade teacher, Mrs. Coulahan, submitted a third-party correspondence letter dated April 22, 2010. In the letter, Mrs. Coulahan explained that Claimant had severe problems with focusing and that he "shut down", refusing to go to his assigned center or join his reading group. She explained that he was oppositional, would not follow her directions, and started doing whatever activities he wanted to do without asking permission. She estimated that Claimant focused less than 20 percent of the time. She indicated that Claimant's ADHD

symptoms were not under control with his daily regime of Risperdal[3] and Metadate CD[4]. However, she indicated that Claimant worked at centers fairly well. R. 238-240.

Claimant's progress reports for the 2009 to 2010 school year showed that during the second trimester, he was meeting expectations in all subjects, he "progressed nicely" from a level "A" to "D" in reading, he showed good effort in his work, he was very verbal and articulate, and he had "really improved". However, in the third trimester, Claimant regressed in reading, language arts, science, and social habits, and was not meeting standards in these areas. The reports noted significant behavioral problems, and advised that Claimant needed improvement in the areas of working and playing well with others, being courteous and cooperative with authority, assuming responsibility for his own actions, and following class rules and procedures. His teacher advised that although Claimant is a "bright and articulate" student, his behavioral problems hampered his academic progress. R. 226-234; 242-252.

The school records also contained discipline and/or suspension forms for seven incidents from August, 2009 through October, 2010 and a Special Education Request for Assistance form dated 10/17/2010.[5] The incident reports describe a pattern of aggressive behavior, including grabbing classmates, kicking and punching his teachers and the principal, threatening to bite, throwing and tearing up papers, rolling chairs, refusing to comply with teachers' orders, leaving the classroom without permission and running through the halls, pounding on his desk, and

---

[3] Risperdal is an atypical antipsychotic drug used for the treatment of schizophrenia and bipolar I disorder. *See* Physician's Desk Reference 1269 (67th ed. 2013).

[4] Metadate CD is a central nervous system stimulant used for the treatment of ADHD. *See* http://www.rxlist.com/metadate-drug.htm. Metadate CD is not listed in the 2013 Physician's Desk Reference.

[5] Claimant submitted one notice of suspension and the Special Education Request for Assistance form to the Appeals Council after the ALJ issued her opinion. R. 252, 438-442. The Claimant did not argue in his brief in support of his motion for summary judgment that these records are new and material and should be considered by this Court. Accordingly, any argument regarding these records is forfeited and the Court will not consider these records in rendering its opinion. *Eads v. Sec'y of Dep't of Health & Human Servs.*, 983 F.2d 815, 817-18 (7th Cir. 1993) (new evidence first submitted to the Appeals Council is not part of the administrative record where Appeals Council denied review).

screaming.  Claimant's teachers reported that he would often shut down, not respond to them, and eventually "blow up" and get out of control if he could not have his way.  The school suspended Claimant three times during this period for his behavior. R. 227, 231-234, 248-252, 438-442, 443-450.

**D. *Medical Evidence***

Ms. Kline first brought Claimant to a medical professional for his uncontrollable behavior on July 24, 2007 when Claimant was 4 years old.  Dr. Joy Deleoz, M.D. examined Claimant at the Crusader Clinic and diagnosed him with hyperactivity and poor concentration. She provided Ms. Kline with a questionnaire and directed her to follow up with another doctor for an attention deficient hyperactivity disorder ("ADHD") evaluation. R. 266.

On June 24, 2008, Claimant underwent a mental health assessment at the Janet Wattles Center in Rockford, Illinois.  Tammy McCammant, LCSW/LPHA, Erin Gasim, MAAT/QMPH, and Jim Brown, BS, QMPH, examined Claimant.  During the assessment, Ms. Kline reported that Claimant had a history of self-harm, not following directions, hitting others, misbehaving, head banging, hyperactivity, and out-of-control aggression.  She also reported that Claimant's father abused her and Claimant emotionally and physically in the past, but he was incarcerated at the time of the examination.  Claimant received a global assessment of functioning ("GAF") of 43, indicating serious symptoms in school and social functioning.  The examining medical professionals diagnosed Claimant with ADHD, combined type, reactive attachment disorder of infancy or early childhood, and a mood disorder, and recommended individual and family counseling. R. 270-289.

Claimant went to OSF Medical Group on August 22, 2008 complaining of a cut on his head and ADHD symptoms. The doctors prescribed Claimant 2.5 milligrams Adderall[6] for his ADHD symptoms. Claimant returned to OSF Medical Group on September 12, 2008 because he was fighting, not listening, hitting, and had poor focus. The doctor doubled Claimant's dosage of Adderall to 5 milligrams. R. 293-294.

Following an incident at his pediatrician's office on November 3, 2008 during which Claimant would not calm down, Ms. Kline brought Claimant to the emergency room at Swedish American hospital. According to the emergency room report, Ms. Kline stated that Claimant ran out of his Adderall prescription. Dr. Scott Bailey, M.D., noted that Claimant presented alert, pleasant, and cognizant of his actions at the doctor's office. Dr. Bailey doubled Claimant's prescription for Adderall to 5 milligrams twice daily. R. 257-258.

Two state agency psychologists reviewed claimant's file in late 2008 and provided opinions as to his functional capabilities. First, Dr. Donna Hudspeth, Ph.D., reviewed Claimant's file in November 2008 and opined that although Claimant had ADHD and a behavioral disorder, he did not meet, medically equal, or functionally equal a listed impairment. Specifically, she found that Claimant had no marked limitations; less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself; and no limitations in moving about and manipulating objects and health and physical well-being. In support of her finding that Claimant had less than marked limitations in attending and completing tasks, Dr. Hudspeth noted that Claimant was diagnosed with ADHD and his teacher could tell when he did not take his medication. She also

---

[6] Adderall is a central nervous system stimulant used to treat ADHD. *See* Physician's Desk Reference 2273 (67th ed. 2013).

noted that Claimant paid attention for 15 minutes and that his teacher noted one obvious problem and some slight problems in this domain. R. 309-314.

Second, Dr. Ronald Havens, Ph.D., reviewed Claimant's file in December 2008 and concurred with Dr. Hudspeth's finding that although Claimant's impairments were more than non-severe, he did not meet, medically equal, or functionally equal a listed impairment. Specifically, he found that Claimant had no marked limitations; less than marked limitations in the domains of attending and completing tasks, interacting and relating with others, and caring for himself; and no limitations in acquiring and using information, moving about and manipulating objects and health and physical well-being. R. 359-364.

In December 2008, Dr. Richard Jaconette, M.D. LPHA of the Janet Wattles Center, reported in progress notes that despite attending family and individual therapy sessions with Jim Brown, BS, QMHP, the Claimant had an intense and irritable affect/mood and extreme aggression. Dr. Jaconette noted that Claimant had a family history of bipolar disorder and prescribed Risperdal to Claimant to help with Claimant's outbursts. He also increased Claimant's prescription for Adderall, adding a noon dose of the medication to help Claimant maintain focus and concentration in the afternoon. R. 315-322.

On January 7, 2009, Claimant's treaters at the Janet Wattles Center completed a treatment plan review and reassessment. The reassessment noted that Claimant made progress in identifying and regulating his emotions and that his attendance and participation in treatment was satisfactory. Claimant took .25 milligrams of Risperdal and 5 milligrams of Adderall twice daily. He had a children's global assessment scale ("C/GAS") score of 55. The examiners recommended continuing individual counseling, family counseling, and medication and enrolling Claimant in organized social or recreational activities. R. 406-407.

Claimant's treaters completed another treatment plan review/reassessment on June 9, 2009. This report indicated that Claimant showed improvement, specifically in focus and concentration. Additionally, his hyperactivity and impulsivity decreased since his medication was adjusted. Claimant took .5 milligrams of Risperdal twice daily, and 30 milligrams of Metadate CD in the morning and 20 milligrams at noon. The report noted that Claimant's participation in treatment was inconsistent. R. 402-405.

On June 22, 2009, Claimant underwent a second mental health assessment at the Janet Wattles Center to assess the efficacy of his treatment during the past year. The assessment noted that Claimant continued to make progress in emotion management, impulse control, and stabilizing his mood. However, Claimant still experienced periods of inattention, hyperactivity, and impulsivity. Claimant's medication had not changed since the June 9, 2009 report. The report indicated that Claimant was normal in all categories, including affect, mood, interview behavior, flow of thought, insight, sensorium, speech patterns, facial expressions, dress, and motor activity. Claimant's DSM diagnosis in Axis I was ADHD, combined type, and Axis IV was problems with primary support group and educational problems. He had a C/GAS score of 57. The examiners recommended individual and family counseling and continued medication. R. 390-399.

Claimant's treaters at the Janet Wattles Center completed another treatment plan review and reassessment on December 17, 2009. They noted that Claimant's focus and concentration remained good, and that incidents of aggression and outbursts decreased until recently. Claimant's attendance and participation in treatment was inconsistent and needed to improve. They again recommended that Claimant participate in age-appropriate organized social and/or recreational activities. R. 400-401.

During a family counseling session on January 27, 2010, Claimant's mother reported to Mr. Brown that she saw a "big difference" in Claimant's behavior after Dr. Jaconette adjusted Claimant's medication. Moreover, because of Claimant's significantly improved behavior, the school declined to complete an IEP or 504 plan for Claimant. Mr. Brown noted that Claimant's mood and behavior were stable and that his ADHD symptoms were well-managed. R. 375

Claimant missed his scheduled therapy appointment on February 16, 2010. However, Mr. Brown spoke with Claimant's mother, who reported that his mood and behavior were good at school and had improved at home. R. 373-74.

Following Claimant's suspension from school for a violent outburst, Mr. Brown and Ms. Kline had a telephonic client-centered consultation on February 25, 2010. Claimant's mother reported that Claimant had experienced rapid mood swings and needed an increase or change in medication. Mr. Brown placed a med action request to Dr. Jaconette. R. 372.

On March 4, 2010, Mr. Brown had an individual therapy session with Claimant. Claimant acknowledged his bad behavior at school, and Mr. Brown counseled him on anger management skills. Mr. Brown noted that Claimant had mood swings and aggressive behavior at school, but behaved well during the session. R. 370.

Claimant and his mother met with Karen Ann Craglow, BS, RN, QMPH, and Dr. Jaconette for medication monitoring on March 18, 2010. Ms. Craglow noted that Claimant had been extremely aggressive with liable mood on his prescribed medication. Dr. Jaconette indicated that Claimant's ADHD was "fairly well controlled" with his current medication, but that he struggled with extreme aggressive outbursts and rapid mood swings. Dr. Jaconette increased Claimant's Risperdal to 1 milligram in the morning and .5 milligram at noon and ordered no change in Claimant's Metadate CD dosage. Dr. Jaconette scheduled a follow-up

appointment in May. R. 368-369. Dr. Jaconnette wrote a note dated March 29, 2010, indicating that Claimant could benefit from an IEP, a change in educational setting, and/or a self-contained classroom. R. 487.

Claimant and his mother had family therapy sessions with Mr. Brown on April 20, 2010 and May 11, 2010. Mr. Brown indicated that Claimant's mood and behavior were generally stable. Claimant reported that his mood and behavior were good and that he talked out issues with his mother. Ms. Kline reported that Claimant was generally manageable at home, but that he continued to have emotional outbursts at school. R. 367, 410-412.

On May 13, 2010, Dr. Jaconette increased Claimant's medication to 2 milligrams of Abilify once in the morning, 40 milligrams of Metadate CD in the morning, and 30 milligrams of Metadate CD at noon. R. 408-409.

In June 2010, Claimant's treaters at the Janet Wattles Center completed another treatment plan and mental health assessment. He was diagnosed with a mood disorder, not otherwise specified, ADHD, hyperactive-impulsive type, and oppositional defiant disorder ("ODD"). Mr. Brown noted that Claimant's attendance at therapy was intermittent and that he missed several appointments. Although his focus and concentration were good and his hyperactivity had decreased, he remained impulsive. Mr. Brown noted that Claimant made progress in identifying, communicating, and regulating his emotions. Claimant's GAF was 55. Claimant's medication had not changed since the May 13, 2010 report. R. 413-434.

*E. The ALJ's Decision – September 20, 2010*

After a hearing and review of the medical evidence, the ALJ determined that Claimant was not disabled and denied his application for SSI benefits. R. 81-93. The ALJ evaluated Claimant's application under the requisite three-step sequential evaluation process to determine

whether he was disabled. R. 81-84. The ALJ noted that Claimant was a preschooler when he filed his application for benefits, but mistakenly reported that Claimant was also a preschooler at the time of the hearing. R. 84. In fact, Claimant was seven years old and entering second grade at the time of the hearing, making him a school-aged child. *See* 20 C.F.R. § 416.926a(h)(2)(iii). At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since July 9, 2008, the application date. R. 84. At step two, the ALJ determined Claimant had the following severe impairments: ADHD; mood disorder, not otherwise specified; and ODD. R. 36. At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 84. The ALJ stated that Claimant's impairments did not meet Listings 112.04 (Mood Disorders), 112.08 (ODD), or 112.11A (ADHD). R. 84. Critically, to infer the result that Claimant's impairments did not meet the Listing for ADHD, the ALJ stated:

> [T]he claimant does not present evidence of marked inattention, impulsiveness, and hyperactivity. Additionally, there is no evidence that the claimant's impairment caused marked impairments in at least two of the following: age-appropriate cognitive/communicative function, social functioning, personal functioning, or concentration, persistence, or pace. Additionally, the undersigned notes the claimant's ADHD symptoms are mostly controlled while on medication.

R. 84.

The ALJ also found that Claimant did not have an impairment or combination of impairments that functionally equaled listings 20 C.F.R. 416.924(d) or 416.926(a). R. 85. In the six relevant functional equivalence domains, the ALJ found that Claimant had marked limitations in interacting and relating with others. R. 89-90. Claimant had less than marked limitations in the domains of acquiring and using information; attending and completing tasks; and caring for oneself. R. 88-89. In the remaining domains, moving about and manipulating

objects and health and physical well-being, the ALJ found that Claimant had no limitations. R. 90-92. Because the ALJ found that Claimant did not have marked limitations in at least two domains, the ALJ found that he was not disabled, as defined by the Social Security Act, as of July 9, 2009. R. 93. Of critical importance to this opinion, the ALJ described the Social Security regulations for what a *preschooler* without an impairment in each domain should be able to do, and erroneously reached her conclusions based on this standard. R. 88-93.

Specifically, in the attending and completing tasks domain, the ALJ noted that a preschooler without an impairment should pay attention when spoken to directly; sustain attention in work and play activities; concentrate on completing puzzles and art projects; gather clothes, feed himself, and put away toys independently; wait his turn and obey instructions from caregivers; and play contentedly without constant supervision. She then explained that Claimant had less than marked limitations in this domain because "[a]lthough the claimant presents with problems focusing and sometimes behaves impulsively, he can work at centers fairly well." R. 89.

The ALJ did not specify how much weight she assigned information provided by Claimant's mother, the Claimant's treating psychiatrist Dr. Jaconette, or the Claimant's counselor Mr. Brown. R. 88. However, she noted that although Claimant's mother was generally credible, the evidence as a whole did not support a disabling condition. R. 88. The ALJ assigned great weight to the opinions of the Claimant's teachers because "they have first-hand knowledge of the effect of the claimant's impairments on his daily functioning." R. 88.

## II. LEGAL STANDARD

### A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[7] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, 2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief.").

_____

[7] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

*B. Disability Standard for a Child*

A child is disabled within the meaning of the Social Security Act if the child is not engaged in substantial gainful activity and "has a medically determinable physical or mental impairment or combination of impairments that causes marked or severe functional limitations, and that can be expected to cause death or that has lasted and can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.903. The ALJ applies a three-step sequential evaluation to determine whether an individual under the age of 18 is disabled. 20 C.F.R. § 416.924(a). Under this process, the ALJ must inquire, in the following order, whether: (1) Claimant is engaged in substantial gainful activity; (2) Claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"; and (3) Claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing, or that functionally equals the listing. *Id*.

To functionally equal a listing, the impairment must cause a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain of functioning. 20 C.F.R. § 416.926a(a). The domains of functioning are: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Each domain describes what a child should be able to do throughout five age categories: (1) "newborns and young infants" (birth to age 1); (2) "older infants and toddlers" (age 1 to age 3); (3) "preschool children" (age 3 to age 6, including children in kindergarten but not first grade); (4) "school-age children" (age 6 to age 12, including children in first grade through middle school); and (5) "adolescents" (age 12 to age 18). 20 C.F.R. § 416. 926a (g)(2), (h)(2), (i)(2), (j)(2), (k)(2), (l)(2). An "extreme" limitation occurs when the

impairment interferes very seriously with claimant's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3)(i).  A "marked" limitation occurs when the impairment interferes with Claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(2)(i).

## III. DISCUSSION

### A. Contentions of the Parties

As an initial matter, the Court notes that the majority of Claimant's arguments are at best undeveloped and at worst incoherent.  Judicial resources are scarce, and the Court should not have to decipher a claimant's arguments by piecing together sentence fragments, partial citations to statutes (some relevant, others irrelevant), bulleted lists, and citations to a few exhibits without further explanation of how such evidence supports his arguments. *Firkins v. Astrue*, 1:09-CV-00923-JMS, 2010 WL 3037257, *4 (S.D. Ind. Aug. 3, 2010) ("[T]his Court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel as in this case.") (internal citations omitted).[8]

However, although woefully underdeveloped, the Court cannot ignore two significant errors in the ALJ's opinion identified by the Claimant.[9] *Id*. ("Even a woefully underdeveloped

---

[8] The Court notes that in his briefs, Claimant cites only one case once to support his arguments for remand, and does not explain how that case applies to the facts of his case.  More egregious, however, is Claimant's citation to only three exhibits in his briefs with no explanation of how that evidence supports his arguments.  In support of his arguments, Claimant states, "Ample evidence in the record (Exhibits 3,13 [sic] and 13F, among others) exists that [Claimant] meets the A. criteria of Section 112.11 for ADHD."  Further, the Court notes that there are no exhibits "3" and "13" in the record.  The Court strongly encourages counsel to adequately develop his arguments by applying the law to the facts in subsequent briefs.  If counsel continues to file briefs lacking cogent arguments supported by both law and facts, he runs the risk that the Court will find his arguments waived. *Buford v. Astrue*, 3:09-CV-342 CAN, 2010 WL 3075015, *8 (N.D. Ind. Aug. 2, 2010) ("An undeveloped argument is a waived argument.")

[9] Claimant's brief also makes the following assertions in a rambling, stream-of-consciousness fashion: (1) the ALJ's analysis of why Claimant failed to meet or medically equal any listed impairment was inadequate; (2) the ALJ did not analyze the "whole child" as required by SSR 09-1p-2p; (3) the ALJ erred by failing to have a medical expert testify at the hearing; (4) the record contains 10 pages of medical records from a different claimant and some duplicate records for Claimant, so there may be missing records, and (5) because the ALJ found that Claimant was

argument is not necessarily forfeited when the district court knew and understood the argument the party intended to make.")  First, Claimant argues that the ALJ erroneously determined that Claimant's condition did not satisfy the requirements for a finding of disability under Listing 112.11A for ADHD.  Claimant argues that the ALJ failed to address evidence contrary to her finding, specifically the Janet Wattles Center mental health assessment, treatment plan, and progress notes from January 7, 2009 through May 13, 2010.

Second, Claimant objects to the ALJ's finding that Claimant had less than marked limitations in the domain of attending and completing tasks, and the analysis and evidentiary support for that finding.  Claimant argues that the ALJ erred in finding that he had less than marked limitations in this domain, and that the record supports a finding of a marked limitation in this domain.  Claimant raises the following issues: (1) the ALJ incorrectly analyzed Claimant's limitations under the standard for a preschooler, not a school-aged child, (2) the ALJ failed to address evidence contrary to her finding that Claimant had a less than marked limitation in this domain; and (3) the ALJ failed to adequately explain her findings.

The Commissioner contends that the ALJ's findings are supported by substantial evidence in the record as a whole.  The parties do not take issue with the ALJ's findings as to the other five domains of functioning.  Accordingly, this Court's analysis is limited to the record evidence, testimony, and the ALJ's findings related to whether Claimant's combination of impairments met or medically equaled Listing 112.11A for ADHD and to Claimant's ability to attend and complete tasks.

---

marked in the interacting and relating with others domain, he met the B criteria for 112.11A.  However, the Claimant does not provide any argument or support for these contentions.  Because the Claimant did not adequately develop these arguments by applying the record evidence to the applicable law, they are forfeited. *Warner v. Astrue*, 880 F. Supp. 2d 935, 945 (N.D. Ind. 2012) (deeming claimant's perfunctory two-sentence argument unsupported by pertinent authority forfeited).

**B. Analysis**

The Court agrees with the Claimant that the ALJ erred by failing to properly analyze whether Claimant's impairments or combination of impairments met or medically equaled Listing 112.11A. Additionally, the ALJ's analysis of the attending and completing tasks domain of functioning was deficient. The ALJ analyzed Claimant's limitations under the wrong age standard, failed to address records conflicting with her findings, and failed to build a logical bridge supporting her conclusion.

**1. Analysis of Disability under Listing 112.11A for ADHD**

First, Claimant argues and the Court agrees that the ALJ failed to consider or discuss the evidence in light of the applicable Listing 112.11A for ADHD. The ALJ found that Claimant's impairments do not meet nor medically equal a listing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ considered whether Claimant qualified for benefits under three listings, 112.04 for mood disorders, 112.08 for ODD, and 112.11A for ADHD.[10]

ADHD under Listing 112.11A is characterized by "developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." 20 C.F.R. Part 404, Subpart P, Appendix 1, Rule 112.11A. The regulations provide a list of factors that a claimant must prove to qualify for SSI. The required level of severity for ADHD is met when the requirements in both A and B are satisfied. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.11A. Section 112.11A provides that:

A. Medically documented findings of all three of the following:
1. Marked inattention, and
2. Marked impulsiveness, and

---

[10] The Claimant did not challenge the ALJ's findings relating to Listings 112.04 (Mood Disorders) or 112.08 (ODD) in his briefs. Because these issues were not raised by Claimant, the Court will not address them. *Bratton v. Roadway Package System*, 77 F.3d 168, 173 n. 1 (7th Cir. 1996); *Bollas v. Astrue*, 694 F. Supp. 2d 978, 990 (N.D. Ill. 2010) ("Issues not raised in a claimant's initial brief are generally waived for purposes of review.")

3. Marked hyperactivity.

AND

B. For ... children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 112.11A. Paragraph B2 of 112.02 provides that:

For children (age 3 to attainment of age 18), resulting in at least two of the following:
a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or
b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 112.02(B)(2).

The ALJ's explanation why the Claimant did not meet the listing requirements for

112.11A is cursory:

[T]he claimant does not present evidence of marked inattention, impulsiveness, and hyperactivity. Additionally, there is no evidence that the claimant's impairment caused marked impairments in at least two of the following: age-appropriate cognitive/communicative function, social functioning, personal functioning, or concentration, persistence, or pace. Additionally, the undersigned notes the claimant's ADHD symptoms are mostly controlled while on medication.

R. 84. This perfunctory conclusion, devoid of any analysis, does not enable meaningful judicial review. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785-86 (7th Cir. 2003) ("Such a lack of reasoning prevents us from applying the decision structure undergirding disability determinations to a substantive analysis of [the claimant's] impairments."); *Pena ex rel. Pena v. Barnhart*, 01 C 50455, 2002 WL 31527202, *8-10 (N.D. Ill. Nov. 13, 2002). Although the ALJ outlined the requirements of Listing 112.11A, including the A and B criteria, she erred by not analyzing Claimant's impairments in conjunction with the Listing. *Id*. Merely identifying the Listing's requirements is not the same as analyzing whether the requirements are met.

Moreover, the ALJ's opinion mischaracterizes certain evidence in the record and does not sufficiently discuss the conflicting evidence regarding the severity of Claimant's impairments. The ALJ's contention that the Claimant presents *no evidence* of marked inattention, impulsiveness, and hyperactivity is patently incorrect. Indeed, the Claimant produced a significant amount of evidence of his inattention, impulsiveness, and hyperactivity. For instance, Claimant's first grade teacher, whose opinion the ALJ afforded *great weight*, reported in April, 2010 that Claimant focused less than 20 percent of the time, "shut down", and would do whatever he wanted to do without asking permission. R. 238-240. Claimant's last report card noted significant behavioral problems, including impulsiveness, aggression, and not following directions. R. 242-252. Claimant was suspended 3 times for behavioral problems. R. 227, 231-234, 248-252, 438-442, 443-450. Despite changes in his medication, Claimant's counselor and psychiatrists reported that Claimant still experienced periods of inattention, hyperactivity, and impulsivity in 2009 and 2010. R.370, 372, 390-399, 413-434. Ms. Kline and Claimant both testified that he forgot homework on the bus and had to complete a significant number of make-up assignments. R. 50, 70-71. Ms. Kline further testified that she had to supervise Claimant to

24

make sure he completed his assignments. R. 51. However, the ALJ's opinion is silent as to this evidence.

The only elaboration that the ALJ gives for finding that the Claimant does not meet Listing 112.11A is that "Claimant's ADHD symptoms are mostly controlled on medication." However, the record reflects that Claimant's treaters changed Claimant's prescribed medication four times (Adderall, Risperdal, Metadate CD, and Abilify) and adjusted the dosage 8 times because his symptoms were out of control. Sometimes Claimant's ADHD symptoms were controlled fairly well by the medication. *See* R. 402-405 (Claimant's hyperactivity and impulsivity decreased with change in medication in June 2009); R. 375 (Claimant's symptoms were well-managed in January 2010); R. 368-369 (Claimant's ADHD was fairly well controlled in March 2010). At other times, Claimant's ADHD symptoms were out of control. *See* R. 390-399 (Claimant still experienced periods of inattention, hyperactivity, and impulsivity in June 2009); R. 238-240 (Claimant's teacher reported his ADHD symptoms were out of control and he focused less than 20 percent of the time in April 2010); R. 413-434 (Claimant remained impulsive in June 2010); R. 49-51, 54 (in August 2010, Ms. Kline reported that Claimants although Claimant's focus improved with new medication, he still had difficulty remaining focused and getting frustrated).

The ALJ has a duty to acknowledge contrary evidence and failed to do so here. *See Blakes ex rel. Wolfe*, 331 F.3d at 568-69; *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). Although it may not change the ALJ's ultimate conclusion, she should have at least discussed whether this evidence meets the requirements of Listing 112.11A. Accordingly, the ALJ's deficient analysis of this Listing warrants remand. *Adams ex rel. T.H. v. Astrue*, 08 C 7265, 2011

WL 3273124 (N.D. Ill. July 26, 2011) ("[T]he ALJ's failure to cite or analyze the applicable Listing or address evidence favorable to the plaintiff requires remand.").

The Court is not suggesting that the ALJ's determination is incorrect. The evidence may support that the severity of Plaintiff's ADHD does not satisfy the requirements of Listing 112.11A. However, the regulations require greater elaboration to support such a finding. The ALJ should discuss the evidence at least to the extent to show the Court the path used by the ALJ to reach her finding, including the evidence accepted and the evidence rejected. Additionally, the ALJ should reevaluate Claimant, who is now older, to obtain an up-to-date determination of his condition.

### 2. Limitations in Attending and Completing Tasks

The ALJ's analysis of Claimant's level of functioning relating to attending and completing tasks domain is flawed. In this domain, the ALJ considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). "Attention" involves a child's level of alertness, ability to filter out distractions, capacity to change focus when interruptions occur, and ability to maintain focus long enough to complete a task. *Id.* § 416.926a(h)(1)(i).

Several aspects of the ALJ's analysis of this domain are deficient. First, the ALJ erred by assessing the severity of the Claimant's impairments in the wrong age category. When applying the age categories, "the claimant's age as of the time of the decision governs in applying the regulations." *Leal v. Comm'r of Soc. Sec.*, 3:08 CV 226, 2012 WL 864458, *4 (N.D. Ohio Mar. 13, 2012). Like all domains, the regulations set forth age group descriptors for different ages. Preschool children (age 3 to the attainment of age 6) should be able to: "pay attention when you

26

are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects.  You should also be able to focus long enough to do many more things by yourself, such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys.  You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else." 20 C.F.R. § 416.926a(h)(2)(ii).   School-age children (age 6 to the attainment of age 12) "should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments… concentrate on details and not make careless mistakes in your work…" *Id*. § 416.926a(h)(2)(iii).  Examples of limited functioning that could be either marked or extreme include, but are not limited to, being easily startled or distracted, being slow to focus on or complete activities, being sidetracked from tasks, becoming easily frustrated, giving up on tasks, and needing extra supervision to complete tasks. *Id.* § 416.926a(h) (3)(i)-(v).

Here, the ALJ erred by citing the preschooler standard, despite Claimant being seven years old and a second grader at the time of the decision.  As the Commissioner's brief concedes, this places him in the school-age child category.  However, the Commissioner defends the ALJ's error by arguing that (1) the Claimant's argument was undeveloped and thus forfeited, and (2) the incorrect citation constituted harmless error. [Doc 19 at 9]  As explained earlier, the Court finds that the Claimant has not forfeited this argument.  Moreover, as explained below, the ALJ's error was not harmless.

As in any domain of functioning, when evaluating a child's limitations in the domain of attending and completing tasks, the ALJ must consider "how appropriately, effectively, and independently the child functions to *children of the same age who do not have impairments*."

SSR 09–4p (emphasis added). The ALJ did not discuss the school-age child standard or whether

the evidence supported a finding of marked in this category. Indeed, the age descriptors for

preschool-aged and school-aged children describe markedly different levels of functioning.

School-aged children without marked limitations in this domain function at higher levels than

preschool-aged children, including being required to follow classroom directions and complete

homework assignments. *Compare* 20 C.F.R. § 416.926a(h)(2)(ii) *with* § 416.926a(h)(2)(iii).

Although Claimant's functioning may have been appropriate for a preschooler, there is record

evidence reflecting serious problems in this domain that may have risen to the level of marked

for a school-aged child. *See* R. 227, 231-234, 238-240, 242-252, 248-252, 438-442, 443-450.

The ALJ erred by applying the wrong age category in reaching her finding when the correct age

category would require considerations that the ALJ failed to address. *See Leal*, 2012 WL 864458

at *4. Accordingly, the decision of the Commissioner is not supported by substantial evidence.

Second, even if the ALJ's citation of the wrong standard was inadvertent and would

constitute harmless error, the ALJ's bare-bones analysis of this domain mischaracterizes the

evidence used to support her finding. Like her analysis of Listing 112.11A, the ALJ's analysis

of this domain is remarkably brief:

> The claimant has less than marked limitation in attending and completing tasks.
> Although the claimant presents with problems focusing and sometimes behaves
> impulsively, he can work at centers fairly well. *See* 9F. Accordingly, the
> claimant has less than marked limitations in this area.

R. 89. In finding that Claimant had less than marked limitations in the attending and completing

tasks domain, the ALJ supports her finding with one sentence taken out of context from a

teacher's third-party correspondence to the SSA. Indeed, the Court finds the ALJ's

mischaracterization of this evidence particularly troubling. Mrs. Coulahan, the Claimant's first

grade teacher, submitted her 2-page correspondence to the SSA in April, 2010.  In the letter,

Mrs. Coulahan explained that Claimant had severe problems with focusing, he "shut down", he

refused to go to his assigned center or join his reading group, he was oppositional, he would not

follow her directions, and he started doing whatever activities he wanted to do without asking

permission.   She estimated that Claimant focused less than 20 percent of the time and that his

ADHD symptoms were not under control with his medication. R. 238-240.  The Claimant's

behavior, as described by Mrs. Coulahan in this letter, closely tracks the examples of marked or

extreme limitations in this domain provided in 20 C.F.R. § 416.926a(h)(1)(i).  The ALJ plucked

one favorable sentence from the letter in support of her findings, mischaracterizing the nature

and content of the letter. *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009) (remanding where

ALJ mischaracterized the record); *Triplett v. Colvin*, 12 C 4382, 2013 WL 6169562, *7 (N.D. Ill.

Nov. 25, 2013) (an ALJ cannot "merely mine the record for a few isolated gems of good

cheer.").

    Third, the ALJ failed to build a logical bridge between the record evidence and her

finding in this domain.   The ALJ did not adequately support her finding in this domain.  The

Seventh Circuit has held that "the ALJ must consider 'all relevant evidence' and may not analyze

only that information supporting the ALJ's final conclusion." *Godbey v. Apfel*, 238 F.3d 803,

808 (7th Cir. 2000) (citing *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000)).  Although the

ALJ is not required to articulate her reasons for rejecting every piece of evidence, she must at

least minimally discuss evidence that contradicts the Commissioner's position. *Id*.  Additionally,

the ALJ must explain "why strong evidence favorable to the plaintiff is overcome by the

evidence on which an ALJ relies." *Giles ex rel. Giles*, 483 F.3d at 488.

In this case, the ALJ disregarded other evidence contrary to her finding. The ALJ did not explain why certain record evidence was insufficient to find a marked limitation in attending and completing tasks. For instance, Claimant's school records reflect problems in this domain. In addition to Mrs. Coulahan's letter analyzed above, Ms. Williams reported that Claimant had some problems in this domain in her 2008 teacher questionnaire. R. 133-136. Claimant's 2009 to 2010 progress reports and disciplinary records show that the Claimant refused to follow directions, became frustrated, and needed improvement in following class rules and procedures. R. 226-234, 242-252, 438-442, 443-450. Claimant's medical records show a waxing and waning of ADHD symptoms with bipolar traits over the course of two years. Although Claimant's focus and concentration were good at times, he still experienced periods of inattention, hyperactivity, and impulsivity. R. 390-399. The ALJ erred by not explaining why she did not credit other record evidence that was favorable to Claimant. *See Hopgood ex rel. L.G.*, 578 F.3d at 700; *Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *A.H. ex rel. Williams v. Astrue*, 09C6981, 2011 WL 1935830, *13-15 (N.D. Ill. May 18, 2011).

The Court recognizes that there is evidence in the record weighing against a finding of marked in this domain. For example, state agency Drs. Hudspeth and Havens both concluded that Claimant was less than marked in this domain in their 2008 reports. R. 309-314, 359-364. Claimant's 2009 to 2010 school records indicated that he was meeting standards or progressing in certain subjects. R. 226-234; 242-252. Some treatment notes form the Janet Wattles Center indicated that Claimant's focus and concentration "were good". R. 400-401; 375. However, other evidence contained in the record that supports the finding and cited in the Commissioner's brief cannot be used now to seek affirmance on appeal. *Smith v. Astrue*, 467 F. App'x 507, 510-

11 (7th Cir. 2012).  The favorable evidence selectively summarized in another section of the ALJ's decision is not tied to the ALJ's analysis of the Claimant's ability to remain focused.  The Court cannot build the logical bridge for the ALJ. *See id*. at 510-11 ("An ALJ must explain her reasoning, building a so-called "logical bridge" that connects the evidence and her decision.")  The ALJ erred by failing to cite this evidence and by not adequately explaining how this evidence, and other substantial evidence in the record, supported her finding. *Id*.

## IV. CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied.  This case is remanded to the SSA for further proceedings consistent with the Memorandum Opinion and Order.

It is so ordered.

Date: January 9, 2014          By: _____
                                        Iain D. Johnston
                                        U.S. Magistrate Judge